# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 15-4458

ERIC J. STEWART, APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued February 13, 2018[1]                                    Decided December 20, 2018)

*Emma L. Peterson*, with whom Zachary M. Stolz, both of Providence, Rhode Island, for the appellant. *Angela Bunnell*, of Providence, Rhode Island was on the brief for the appellant.

*James L. Heiberg*, with whom *Leigh A. Bradley*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Thomas E. Sullivan*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before DAVIS, *Chief Judge*, and SCHOELEN and PIETSCH, *Judges*.

PIETSCH, *Judge*, filed the opinion of the Court. DAVIS, *Chief Judge*, filed an opinion concurring in part and dissenting in part. SCHOELEN, *Judge*, filed an opinion concurring in part and dissenting in part.

PIETSCH, *Judge*: Eric J. Stewart appeals an October 20, 2015, Board of Veterans' Appeals (Board) decision that denied his claim for disability compensation benefits under 38 U.S.C. § 1117 for a medically unexplained chronic multisymptom illness (MUCMI) incurred during the Persian Gulf War. Record (R.) at 2-10. Because the Board misapplied the VA regulation governing presumptive service connection for MUCMIs and relied on an inadequate medical examination for its decision, the Board decision will be vacated and the matter will be remanded to the Board for further action.

---

[1] Oral argument was held on February 13, 2018, at Washburn University School of Law in Topeka, Kansas. The Court extends its appreciation to the law school for its hospitality.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

Mr. Stewart served on active duty in the U.S. Army from December 2003 until February 2005, including service in Southwest Asia from February 2004 to January 2005. During his service in Iraq, Mr. Stewart was surrounded by "burn pits"[2] and exposed to smoke from burning garbage and to sand and dust. R. at 54.

In December 2005, Mr. Stewart was treated for and diagnosed with asthma. R. at 54. A January 2006 pulmonary function test revealed that he had obstructive and restrictive pulmonary disease. He filed a claim for disability compensation benefits for asthma in October 2008. R. at 497. In August 2011, Mr. Stewart's private nurse informed VA that Mr. Stewart had a combined obstructive and restrictive pulmonary disease with no known etiology. R. at 220. In December 2013, the Board denied Mr. Stewart's claim. R. at 147-56.

Mr. Stewart appealed the decision to this Court, and, in September 2014, the Court granted the parties' joint motion to vacate the Board decision and remand the matter to the Board for further proceedings. R. at 141-46. The parties concluded that the provisions of 38 C.F.R. § 3.317 pertaining to presumptive service connection for veterans who served in Southwest Asia were "potentially applicable" to Mr. Stewart's claim. *Id*. The parties agreed that the Board had failed to consider "whether [Mr. Stewart's] asthma or combined obstructive and restricted pulmonary disease, constituted a [MUCMI]." R. at 144. In December 2014, the Board remanded Mr. Stewart's claim to the RO to obtain an "appropriate VA examination to determine the nature and etiology of any undiagnosed illness or respiratory infection." R. at 125.

In February 2015, Mr. Stewart underwent a VA examination, at which the examiner noted that there were prior diagnoses of asthma dating back to 2005. R. at 54-59. The VA examiner opined that 2015 pulmonary function tests were consistent with a diagnosis of asthma. *Id*. The examiner diagnosed Mr. Stewart with asthma and stated that he did not have multiple respiratory conditions. R. at 56. The VA examiner, relying on medical literature, discussed the nature of asthma, noting that it is a chronic lung disease involving inflammation and narrowing of the airways of the upper and lower respiratory system, with recurrent periods of wheezing, chest

---

[2] A burn pit refers to an area in military sites devoted to the open-air combustion of refuse, which in Iraq and Afghanistan included plastics, batteries, appliances, medicine, dead animals, human feces, and body parts, with jet fuel being used as an accelerant. The resultant pollutants included dioxins, particulate matter, polycyclic aromatic hydrocarbons, volatile organic compounds, carbon monoxide, hexachlorobenzene, and ash. https//en.wikipedia.org/Burn_pit (last visited Sept. 28, 2018).

tightness, shortness of breath, and coughing. *Id*. The examiner explained that people with asthma have inflamed airways that react "strongly to certain inhaled substances." *Id*. Further, she reported that asthma attacks may be triggered by exposure to substances including allergens such as dust, animal fur, mold, pollen, trees, air pollution, certain medicines, and certain chemicals. *Id*. The examiner opined that Mr. Stewart had no chronic respiratory illness caused by or as the result of service. R. at 58. Additionally, the examiner stated that it was less likely than not that Mr. Stewart had a MUCMI. R. at 59.

On October 20, 2015, the Board denied Mr. Stewart's claim. In doing so, the Board concluded that asthma was not a MUCMI. R. at 8. The Board reasoned that, because the etiology of asthma is "'partially understood,'" it could not be considered a MUCMI. *Id*.

## II. ANALYSIS

### A. Definition of a MUCMI

In reviewing the Secretary's regulation and its consistency with the statute, "the first inquiry is whether the applicable statute provides a clear statement of congressional intent on point." *Sears v. Principi*, 349 F.3d 1326, 1328 (Fed. Cir. 2003). The Supreme Court has stated:

> If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress . . . . [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Res. Def. Counsel, Inc.*, 467 U.S. 837, 842-43 (1984).

Section 1117 of title 38 of the U.S. Code provides presumptive service connection to Persian Gulf War veterans who suffer from a "qualifying chronic disability." The statute states that a "qualifying chronic disability" may result from (a) an undiagnosed illness; (b) a MUCMI "(such as chronic fatigue syndrome, fibromyalgia and irritable bowel syndrome) that is defined by a cluster of signs and symptoms"; or (c) any diagnosed illness that the Secretary determines by regulation warrants a presumption of service connection.

The part of section 1117 regarding what constitutes a MUCMI is plain, and the ordinary meaning of the words can be used to conclude that a MUCMI is a medically unexplained chronic illness. Thus, the Court finds this language clear and unambiguous. However, Congress did not define what it means for an illness to be "medically unexplained." Instead, Congress delegated

3

authority to the Secretary to prescribe regulations to carry out the statute. Specifically, section (d), provides that

> (1) The Secretary shall prescribe regulations to carry out this section.
> (2) Those regulations shall include the following:
>> (A) A description of the period and geographical area or areas of military service in connection with which compensation under this section may be paid.
>> (B) A description of the illnesses for which compensation under this section may be paid.
>> (C) A description of any relevant medical characteristic (such as a latency period) associated with each such illness.

38 U.S.C. § 1117(d).[3]

At issue in this case is 38 C.F.R. § 3.317(a)(2)(ii), which VA implemented to carry out section 1117. This regulation represents VA's attempt to fill a gap left by the statute, which provides no definition for the phrase "medically unexplained." When an agency fills a gap left by the statute, "courts may not disturb an agency rule unless it is 'arbitrary or capricious in substance, or manifestly contrary to the statute.'" *Jernigan v. Shinseki*, 25 Vet.App. 220, 225 (2012) (quoting *Mayo Foundation for Medical Educ. & Research v. U.S.*, 562 U.S. 44, 52 (2011)). Instead, "courts will defer to an agency's 'reasonable interpretation of the statute.'" *Id.* (quoting *Gallegos v. Principi*, 283 F.3d 1309, 1312 (Fed. Cir. 2002). That regulation states:

> the term MUCMI is a diagnosed illness without conclusive pathophysiology or etiology, that is characterized by overlapping symptoms and signs and has features such as fatigue, pain, disability out of proportion to physical findings, and inconsistent demonstration of laboratory abnormalities. Chronic multisymptom illnesses of partially understood etiology and pathophysiology, such as diabetes and multiple sclerosis, will not be considered medically unexplained.

38 C.F.R. § 3.317(a)(2)(ii) (2018).[4]

It is clear that the regulation seeks to define the undefined statutory phrase "medically unexplained." To that end, VA has decided that "pathophysiology" and "etiology" are decisive factors in determining whether an illness is "medically unexplained."[5] The parties offer different

---

[3] Additionally, 38 U.S.C. § 501(a) provides VA with the "authority to prescribe rules and regulations that are necessary or appropriate to carry out the laws administered by the Department [of Veteran Affairs] and are consistent with those laws."

[4] Both statute and regulation identify signs or symptoms involving the respiratory system as possible manifestations of a MUCMI. 38 U.S.C. § 1117(g)(8); 38 C.F.R. § 3.317(b)(8).

[5] "Pathophysiology" is defined as "the physiology of abnormal states; spec[ifically]: the functional changes that accompany a particular syndrome or disease." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE

4

interpretations of this regulatory provision. Mr. Stewart contends that a MUCMI is a diagnosed illness that lacks *either* a conclusive pathophysiology *or* a conclusive etiology. Appellant's Response (Res.) to Court's January 2017 Order at 5-11. Thus, Mr. Stewart also contends that a chronic multisymptom illness is not considered a MUCMI when the illness has *both* a partially understood etiology and pathophysiology. Appellant's Res. at 5-11. On the other hand, the Secretary contends that a MUCMI is a diagnosed illness that lacks *both* a conclusive pathophysiology *and* a conclusive etiology. Secretary's Res. at 12-16. By contrast, the Secretary argues that a chronic multisymptom illness is not a MUCMI when there is *either* a partially understood etiology *or* a partially understood pathophysiology. Secretary's Res. at 12-16.[6]

The parties' dispute comes down to the proper interpretation of § 3.317(a)(2)(ii). The Court reviews the interpretation of regulations de novo. *See Tropf v. Nicholson,* 20 Vet.App. 317, 320 (2006) The Court begins by examining the language of the regulation. *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409 (1993) ("The starting point in interpreting a statute [or regulation] is its language."); *Goodman v. Shulkin,* 870 F.3d 1383, 1386 (Fed. Cir. 2017) (stating that the rules of statutory construction apply to interpretation of regulations); *Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015) ("Regulatory interpretation begins with the language of the regulation, the plain meaning of which is derived from its text and its structure."). If the plain meaning of the regulation is clear from its language, then that meaning controls and "that is 'the end of the matter.'" *Tropf,* 20 Vet.App. at 320 (quoting *Brown v. Gardner,* 513 U.S. 115, 120, (1994)). If, however, the language is ambiguous, then the Court must defer to the agency's interpretation of its regulation unless that interpretation is inconsistent with the language of the regulation, is otherwise plainly erroneous, or does not represent the agency's considered view on the matter. *See Auer v. Robbins,* 519 U.S. 452, 461-62 (1997).

The regulation is structured so that the first sentence sets forth the characteristics that identify an illness as a MUCMI. Conversely, the second sentence of the regulation announces the

---

ENGLISH LANGUAGE UNABRIDGED 1655 (1966) (hereinafter Webster's). "Etiology" means "a science or doctrine of causation or of the determination of causes." *Id*. at 782. In the context of illnesses specifically, "etiology" is defined as "all of the factors that contribute to the occurrence of a disease or abnormal condition." *Id*.

[6] We note that Chief Judge Davis's dissent finds that the regulation conflicts with the statute because of its use of the phrase "partially understood etiology and physiology." However, neither party argued this in their briefs and when asked at oral argument whether the regulation was inconsistent with the statute, the appellant made clear that he took the position that the regulation was consistent with the statute. Oral Argument Recording at 4:33-6:33, 7:04-8:44.

characteristics that prevent an illness from being a MUCMI. A fundamental canon of regulatory construction is that when interpreting a regulation, the words of the regulation are given "their ordinary, contemporary, common meaning," absent an indication that the words "bear some different import." *Williams v. Taylor*, 529 U.S. 420, 431, 435 (2000); *Perrin v. United States,* 444 U.S. 37, 42 (1979) (stating that "words [in a regulation], unless otherwise defined, will be interpreted as taking their ordinary, contemporary, common meaning").

The first sentence of the regulation describes the characteristics of a MUCMI: "a diagnosed illness without conclusive pathophysiology or etiology." The term "conclusive," modifying "pathophysiology" and "etiology," is defined as "putting an end to a debate or question especially by reason of irrefutability: involving a conclusion or decision: decisive, final." WEBSTER'S at 471. The words "etiology" and "pathophysiology" are joined by the conjunction "or," which is a "function word to indicate . . . an alternative between different or unlike things, states, or actions." *Id*. at 80; *see Drosky v. Brown*, 10 Vet.App. 251, 255 (1997) (holding that the "use of the word 'or' provides for an independent basis rather than an additional requirement"). Thus, the Court concludes that the plain meaning of the first sentence in the subsection is that a multisymptom illness is a MUCMI if *either* the etiology *or* the pathophysiology of the illness is inconclusive.

The second sentence of the subsection states that a multisymptom illness is not a MUCMI when it has a partially understood etiology *and* pathophysiology. "Partially" means "to some extent: partly." WEBSTER'S at 1646. The ordinary meaning of "partially" denotes something that is incomplete, affecting a part rather than a whole of something. *Id*. The words "etiology" and "pathophysiology" are joined by the conjunctive word "and," meaning that a MUCMI does not exist when both the etiology and pathophysiology are partially, but not totally, understood. *See Middleton v. Shinseki*, 727 F.3d 1172, 1178 (Fed. Cir. 2013) (stating that use of the conjunctive "'and' means that a veteran must satisfy three elements to obtain a 40% disability rating). Accordingly, the plain meaning of the second sentence is that a multisymptom illness is *not* a MUCMI if *both* the etiology and the pathology of the illness are partly understood.

For the Secretary's argument to be correct, the word "or" in the first sentence would have to be read as the conjunctive "and." At the same time, the word "and" in the second sentence would have to be read as the disjunctive "or." Such a strained construction is clearly at odds with the plain reading of the regulation. Additionally, the Court observes that the regulation virtually adopts the language used by Congress in the legislative history accompanying the law. Congress explained

6

that its purpose in including MUCMIs as presumptive conditions was to insure "eligibility for chronically disabled Gulf War veterans notwithstanding a diagnostic label by a clinician in the absence of conclusive pathophysiology *or* etiology." 147 CONG. REC. S13,227, 13,238 (daily ed. Dec. 13, 2001) (Joint Explanatory Statement) (emphasis added). Congress continued that "it did not intend for chronic multisymptom illnesses of partially understood etiology *and* pathophysiology" to qualify as MUCMIs. *Id*. (emphasis added). It is noteworthy that the regulation uses the conjunction "or" and the conjunction "and" in the same manner as Congress did in the legislative history. Thus, for the Secretary's argument to prevail, the Court would have to ignore both the plain language of the regulation and the intent of Congress.

Applying the plain meaning of § 3.317(a)(2)(ii) to this case, Mr. Stewart is correct that the Board misapplied the regulation. Under the proper interpretation of the law, an illness is a MUCMI where either the etiology or pathophysiology of the illness is inconclusive. Conversely, a multisymptom illness is not a MUCMI where *both* the etiology *and* the pathophysiology of the illness are partially understood. Here, the Board concluded that Mr. Stewart's asthma was not a MUCMI because asthma has a "partially understood etiology." R. at 8. The Board did not make a finding that the pathophysiology of asthma was also "partially understood," as it was required to do under the law. 38 C.F.R. § 3.317(a)(2)(ii).

## B. The Specific Etiology of a Veteran's Disease

The next issue raised by Mr. Stewart also involves the proper interpretation of § 3.317(a)(2)(ii). He argues that if the etiology of his individual asthma is unknown, it may qualify as a MUCMI, even though the etiology of asthma as it generally affects the public has a partially understood etiology or pathophysiology. Appellant's Brief (Br.) at 7-9; Appellant's Res. to Court's January 2017 Order at 11-15; Appellant's Res. to Court's October 2017 Order at 5-6. In response, the Secretary contends that "etiology" as used in this subsection refers to the cause of the diagnosed illness generally, rather than a specific etiological cause pertaining to an individual veteran. Secretary's Br. at 7-8. Essentially, the parties disagree on whether the term "medically unexplained" requires VA to identify the cause of a specific veteran's illness or whether the question may be resolved by general knowledge in the medical community about the illness.

The U.S. Court of Appeals for the Federal Circuit addressed a similar legal question in *Goodman.* In that case, Mr. Goodman was seeking presumptive service connection for rheumatoid arthritis (RA) as a MUCMI. *Goodman,* 870 F.3d at 1384. In denying his claim, the Board relied

7

on an advisory medical opinion concluding that RA was not a MUCMI because the etiology and pathophysiology of RA were partially understood. This Court affirmed the Board decision. In his appeal to the Federal Circuit, Mr. Goodman argued that this Court misinterpreted § 3.317. He argued that, by allowing the Board to rely on a medical expert opinion that concluded that RA had a partially understood etiology and pathophysiology, the Court effectively allowed the VA medical expert to establish a general rule that was binding in future claims that RA is not a MUCMI. *Id.* at 1386.

The Federal Circuit noted that § 3.317 did not "prohibit medical professionals from professing whether certain medical diseases may constitute a MUCMI." *Id*. at 1387. Further, the Federal Circuit observed that VA's published guidance granted VA adjudicators "'the authority to determine on a *case-by-case basis* whether additional diseases meet the criteria'" for a MUCMI "'in the *same manner* as they make other determinations necessary to decide claims.'" *Id*. (quoting and adding emphasis to 75 Fed. Reg. 61,995, 61,995 (October 7, 2010)). The Federal Circuit held that "the VA adjudicator may consider evidence of medical expert opinions and *all other facts of record* to make the final determination of whether a claimant has proven, *based on the claimant's unique symptoms*, the existence of a MUCMI stated." *Id.* at 1388 (emphasis added).

The Court concludes that the determination of whether an illness is "medically unexplained" is particular to the claimant in each case. In *Goodman*, the Federal Circuit repeatedly stated that a MUCMI determination was to be based on a claimant's unique symptoms and the evidence of record. *Id*. This approach is consistent with this Court's long-standing treatment of medical evidence and treatise evidence in service-connection claims. The Court has held that generic information in a medical journal or treatise that certain factors *could* cause a medical condition does not, as a general matter, establish nexus absent additional evidence that those factors *did* cause a veteran's condition. *See Sacks v. West*, 11 Vet.App. 314, 317 (1998); *see also Libertine v. Brown,* 9 Vet.App. 521, 523 (1996); *Beausoleil v. Brown,* 8 Vet.App. 459, 463 (1996).

If an illness could, as a general matter, be excluded from being a MUCMI on the basis of definitional materials or treatises, there would be no necessity of examining all the facts of record and the claimant's unique symptoms. The Secretary has acknowledged that "[t]he issue of whether a Veteran's *particular chronic multisymptom disability pattern* is without a conclusive etiology . . . must be determined on a case-by case basis and will require a medical opinion." VA Training Letter 10-01 at 5 (emphasis added). Treatise evidence suffices to establish nexus only where

8

"standing alone, [it] discusses generic relationships with a degree of certainty such that, under the facts of a specific case, there is at least plausible causality based upon objective facts . . . ." *Wallin v. West,* 11 Vet.App. 509, 514 (1998). Thus, if definitional or treatise evidence were sufficient to conclusively identify the cause of a claimed illness, that is, with the requisite degree of certainty, the illness would not be medically unexplained. Any lesser degree of certainty would require evaluation of the unique facts of the veteran's situation to determine if his or her illness is medically unexplained.

Having found that a determination of whether a condition is a MUCMI must be based on an individual veteran's circumstances, we now turn to whether the evidence was adequate to decide Mr. Stewart's claim.

### C. Adequacy of Medical Examination

A medical examination is considered adequate "where it is based upon consideration of the veteran's prior medical history and examinations and describes the disability, if any, in sufficient detail so that the Board's 'evaluation of the claimed disability will be a fully informed one.'" *Stefl v. Nicholson*, 21 Vet.App. 120, 123 (2007) (quoting *Ardison v. Brown*, 6 Vet.App. 405, 407 (1994)). The opinion must "support its conclusion with an analysis that the Board can consider and weigh against contrary opinions." *Id*. at 124-25. This Court has held that "most of the probative value of a medical opinion comes from its reasoning" and that a medical examination or opinion "is [not] entitled to any weight . . . if it contains only data and conclusions." *Nieves-Rodriguez v. Peake*, 22 Vet.App. 295, 304 (2008). "Whether a medical opinion is adequate is a finding of fact, which this Court reviews under the 'clearly erroneous' standard." *D'Aries v. Peake*, 22 Vet.App. 97, 104 (2008); *see Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990). A finding of fact is clearly erroneous when the Court, after reviewing the entire evidence, "is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *Gilbert*, 1 Vet.App. at 52.

Here, the parties agree, for different reasons, that the 2015 VA examiner's opinion that Mr. Stewart's asthma was not a MUCMI is inadequate. The Court agrees. Although the VA examiner discussed in great detail the symptoms of asthma and identified the events or substances that may trigger asthma attacks, she did not address the etiology or pathophysiology of asthma, either partial or conclusive. That certain factors may trigger attacks once a person has asthma does not explain why that person contracted asthma in the first place. Factors that may trigger attacks have nothing

9

to do with etiology, which requires an identification of the cause of a condition. Because the VA examiner failed to address the etiology or pathophysiology of Mr. Stewart's asthma, we find the opinion inadequate. On remand, the Board should obtain a medical opinion that addresses this question and provides a clear rationale supporting the opinion.

### III. CONCLUSION

The Board's October 20, 2015, decision is VACATED and this matter is REMANDED for further proceedings consistent with this decision.

DAVIS, *Chief Judge*: *concurring in part and dissenting in part:* I fully endorse the analysis in Section II.B., and concur in the disposition of this case in Section II.C. I dissent from Section II.A., insofar as it may be read to find ambiguity in the phrase "medically unexplained," leading to a conclusion that the Secretary's regulation is valid. As described below, the regulation, 38 C.F.R. § 3.317(a)(2)(ii), setting forth the Secretary's definition of a medically unexplained chronic multisymptom illness (MUCMI), is inconsistent with the plain meaning of the statute and is arbitrary and capricious, and otherwise contrary to the statute.[7] Therefore, the regulation operates in a manner that inappropriately excludes potential medically unexplained multisymptom illnesses from coverage. We should declare it invalid.

The majority suggests that my concerns with the validity of the regulation are not raised by the briefing, and further note a statement at oral argument that the regulation was consistent with the statute.[8] The majority does not mention the supplemental briefing questions issued by the Court, which included the following two questions:

> 1. Is the language of 38 U.S.C. § 1117 ambiguous?
> 2. If so, should the Court accept the Secretary's interpretation of the statute, and how much deference is owed to the Secretary's interpretation?

I believe my concerns with the validity of this regulation are within the scope of these questions and the responses thereto. Indeed, it was those questions that seeded my consideration of the validity of the regulation. Moreover, the appellant's statement at oral argument, even assuming it was a well-considered position, is hardly a reason to ignore the severe defects in this regulation as

---

[7] *See Cox v. McDonald*, 28 Vet.App. 318, 324 (2018) (after determining that a statute is silent or ambiguous with respect to an issue, the Court must determine whether the Secretary's regulation is arbitrary, capricious, or manifestly contrary to the statute).

[8] *See supra* at 5, note 6.

described below. "When an issue or claim is properly before the Court, the Court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing laws."[9]

Furthermore, the majority's view of the record should lead to a decision to refrain from consideration of the validity of the regulation. Instead, the majority goes out of its way to attempt to add the imprimatur of the Court to the regulation in question. I therefore regard the discussion of the majority opinion regarding the validity of the regulation as dicta, that is, not required for the disposition of the appeal as characterized by the majority's view of the record.

The Court's supplemental briefing questions raise the threshold issue of the regulation's conformity with the statute. The interpretation of a statute is a question of law that the Court reviews de novo.[10]

In the regulatory context, however, the Court may not disturb an agency rule *unless* it is "'arbitrary or capricious in substance, or manifestly contrary to the statute.'"[11]

> When a court reviews an agency's construction of a statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the Court as well as the agency must give effect to the unambiguously expressed intent of Congress.[12]

"[I]f the statute is silent or ambiguous with respect to the specific issue," however, "the question for the Court is whether the agency's answer is based on a permissible construction of the statute."[13] Conversely, "no deference is due to agency interpretations at odds with the plain language of the statute itself. Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language."[14] The Court must employ the standard tools of

---

[9] *Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90, 99 (1991); *see also Tatum v. Shinseki*, 24 Vet.App. 139, 144 (2010) (parties' agreement at oral argument cannot bind the Court); *Rykus v. Brown*, 6 Vet.App. 354, 359 (1993) ("The Court is not bound by the Secretary's concessions . . . . ").

[10] *Cook v. Snyder*, 28 Vet.App. 330, 338 (2017).

[11] *Household Credit Services, Inc. v. Pfenning*, 541 U.S. 232, 242 (2004) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)).

[12] *Chevron v. Natural Resources Def. Council*, 467 U.S. 837, 842 (1984).

[13] *Id.* at 842-43.

[14] *Public Employees Retirement System of Ohio v. Betts,* 492 U.S. 158, 171 (1989).

statutory construction, including the canons of statutory interpretation, to determine whether Congress has directly addressed the precise question at issue.[15]

## I. The statutory definition of MUCMI is not ambiguous.

The governing statute provides compensation for Persian Gulf veterans having a "chronic qualifying disability," which is divided into three classes:

A. An undiagnosed illness

B. A medically unexplained chronic multisymptom illness [MUCMI]  (such as chronic fatigue syndrome, fibromyalgia, and irritable bowel syndrome) defined by a cluster of signs or symptoms

C. Any diagnosed illness that the Secretary determines [by regulation] to warrant a presumption of service-connection.

The statutory language for consideration here is: "A medically unexplained chronic multisymptom illness [MUCMI] . . . defined by a cluster of signs or symptoms."[16]

The Secretary asserts that this language contains ambiguity with respect to the phrase "medically unexplained,"[17] but offers no contextual or linguistic reasons why this is so. "[S]imply saying something is ambiguous does not make it so."[18]

"Ambiguity" is defined as "[a]n uncertainty of meaning or intention, as in a contractual term or statutory provision."[19] The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."[20]

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."[21] The term "medically unexplained" is defined neither in section 1117 nor in any other provision of veterans law. Therefore, the ordinary and accustomed meaning of the term applies.[22]

---

[15] *Chevron*, 467 U.S. at 843 n9; *Cathedral Candle Co. v. USITC*, 400 F.3d 1352, 1362 (Fed. Cir. 2005).

[16] 38 U.S.C. § 1117.

[17] Secretary's Response to Supplemental Briefing Order of Jan. 17, 2018, at 8.

[18] *Johnson v. Shinseki*, 28 Vet.App. 237, 254 (2013) (Kasold, C.J., dissenting).

[19] BLACK'S LAW DICTIONARY 93 (9th ed. 2009).

[20] *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

[21] *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).

[22] *Prokarym v. McDonald*, 27 Vet.App. 307 (2015).

"Medically unexplained" simply means that an illness has not been explained by the current knowledge of the medical community. The definition of the word "unexplained" most pertinent to the medical context is "not accounted for or *attributable to an identified cause*: SIDS [sudden infant death syndrome] is still an unexplained phenomenon."[23] Thus, section 1117(a)(2)(B) refers to a chronic multisymptom illness, which the medical community is unable to attribute to *an identified cause*, but characterized by a cluster of signs or symptoms.

Contrary to the suggestion by the majority,[24] the term "medically unexplained" is not undefined and there is no gap for the Secretary to fill. There is nothing in the term "medically unexplained" itself, or in the structure of the statute, that would counsel against applying the term MUCMI to any chronic multisymptom illness not attributable to an identified cause.

The unambiguity of this plain meaning is confirmed by relevant canons of statutory interpretation. First, it is consistent with the *general-terms canon*.

> Without some indication to the contrary, general words (like all words, general or not) are to be accorded their full and fair scope. They are not to be arbitrarily limited. This [canon] is based on the reality that it is possible and useful to formulate categories (e.g., "dangerous weapons") without knowing all the items that may fit . . . within those categories.[25]

The phrase "medically unexplained" is such a general term that is entitled to be applied to the full scope of its plain meaning. Second, this plain meaning is supported by the *omitted-case canon*: a matter not covered by the statute is to be treated as not covered.[26] This canon includes the corollary that a judge, and in this case, the agency, should not derive unprovided-for exceptions to the text. "[I]f the Congress [had] intended to provide additional exceptions, it would have done so in clear language."[27]

Moreover, there is no warrant for construing a snippet of the statutory phrase rather than the entire phrase of which it is a part. "In expounding a statute, we must not be guided by a single

---

[23] NEW OXFORD AMERICAN DICTIONARY 1887 (2010) (emphasis added).

[24] *See supra* at 4.

[25] B. GARNER & A. SCALIA, READING LAW: THE INTERPRETATION OF LEGAL TEXTS at 101 [hereinafter "Garner & Scalia"]; *see, e.g., Slaughter House Cases*, 83 U.S. 36, 73 (16 Wall.) (1872) (although the rights of blacks were in contemplation of Congress in enacting the 13th, 14th, and 15th Amendments, the word "persons" employed in the text of the amendments applied to guarantee to other classes of people the rights protected by those amendments).

[26] *See* Garner & Scalia, *supra* n.25, at 93.

[27] *Petteys v. Butler*, 367 F.2d 528, 538 (8th Cir. 1966) (Blackmun, J., dissenting).

sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy."[28]

In this instance the words "medically unexplained" are given a more precise context by both the neighboring words and the disease examples given.[29] It is clear from the entire phrase that the statute defines a class of "qualifying chronic disabilit[ies]" consisting of illnesses as to which medical understanding has progressed no further than identifying a cluster of characteristic signs and symptoms, and perhaps giving it a name, i.e., a "diagnostic label." There is simply no reason for the Secretary to define the statutory language further by regulation.

"Only where a statute's plain meaning leads to an absurd result that Congress clearly never could have intended is [the] 'plain meaning rule' abandoned for a review of the applicable legislative history and statutory construction."[30] That the plain meaning of "medically unexplained" could lead to the inclusion of such illnesses as diabetes and multiple sclerosis as MUCMIs might be inadvisable, but not absurd. Diabetes is presumptively service connected with respect to herbicide exposure,[31] and multiple sclerosis is a chronic disease that is presumptively service connected if it manifests within 7 years from the date of separation from service.[32] It is therefore unclear that Congress—as opposed to some individual legislators—or the President who signed the bill could not have intended that these conditions be included in the statutory definition of a MUCMI. It is not for the Secretary or the Court to impose such exclusions when the statute does not.

## II. The Secretary's regulation imposes restrictions that contradict the plain meaning of the statute, and the regulation is otherwise inconsistent with the statute.

The implementing VA regulation states:

the term [MUCMI] means a *diagnosed illness* without conclusive pathophysiology or etiology, that is characterized by overlapping symptoms and signs and has features such as fatigue, pain, disability out of proportion to physical findings, and inconsistent demonstration of laboratory abnormalities. Chronic multisymptom

---

[28] *Ortiz-Valles v. McDonald*, 28 Vet.App. 65, 70 (2016) (citing *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am. Inc.,* 508 U.S. 439. 455 (1993)).

[29] *See Freeman v. Quicken Loans*, 566 U.S. 624, 635 (2012).

[30] *Alleman v. Principi*, 16 Vet.App. 253, 255 (2002); *Sabonis v. Brown*, 6 Vet.App. 426, 430 (1994) (same); *Mintz v. Brown*, 6 Vet.App. 273, 282 (same).

[31] 38 C.F.R. § 3.309(e) (2018).

[32] 38 C.F.R. §§ 3.307(a)(3) (2018), 3.309(a). A MUCMI is compensable if it manifested to a degree of 10% by December 31, 2016. 38 C.F.R. § 3.317(a)(1)(i) (2018).

14

illnesses of *partially understood etiology and pathophysiology*, such as diabetes and multiple sclerosis, will not be considered medically unexplained. [33]

## A. The regulation is inconsistent with the plain meaning of the statute.

The concepts of "conclusive pathophysiology or etiology" and "partially understood etiology and pathophysiology" appear nowhere in the statute. The Secretary adopted both sentences of this regulation from the legislative history.[34]

In effect, the regulation operates to constrict the plain meaning of "medically unexplained" as employed in the statute. The full scope of the statutory term "unexplained" can only be shrunk by regulatory concepts of "partially understood etiology and pathophysiology" if one inserts the word "completely," or perhaps "predominantly," in front of the unqualified phrase, as the drafters of the statute did not. A regulation imposing a requirement not imposed by the enabling statute is invalid.[35]

The restrictions in § 3.317(a)(2)(ii) are fundamentally grounded on a notion that Congress would not have intended the term "medically unexplained" to sweep as broadly as the plain language requires. "What Congress 'would have wanted' it did not provide, and that is the end of the matter."[36]

## B. The regulatory definition of MUCMI is inconsistent with the structure of the statute.

"'Statutory terms are interpreted in their context and with a view to their place in the overall statutory scheme.'"[37] Here, the word "diagnosed" is employed in 38 U.S.C. § 1117(a)(2)(C), and its negative in subsection (a)(2)(A), but omitted from subsection (a)(2)(B). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[38] Further, if Congress had intended a MUCMI to be a diagnosed condition, it would be expected that the wording of subsection (a)(2)(C) would have begun "any *other*

---

[33] 38 C.F.R. § 3.317(a)(2)(ii) (emphasis added).

[34] 68 Fed. Reg. 34,539, 34,540 (June 10, 2003); 75 Fed. Reg. 61,995, 61,996 (Oct. 7, 2010); *see* 147 CONG. REC. S. 13,227, 13,238 (daily ed. Dec. 13, 2001) (Joint Explanatory Statement).

[35] *See Brown v. Gardner*, 513 U.S. 115 (1994).

[36] Garner & Scalia, *supra* n.25 at 94.

[37] *Halle v. McDonald*, 28 Vet.App. 112, 116 (2016) (quoting *Tyler v. Cain*, 533 U.S. 656, 662 (2001)).

[38] *Russello v. U.S.*, 446 U.S. 16, 23 (1983).

diagnosed illness." The conclusion to be drawn is that Congress did not consider a MUCMI as a diagnosed condition.

Yet, the Secretary's regulation, purportedly defining MUCMI, begins with the words "a diagnosed condition." It is possible that the Secretary may have meant to invoke the concept of a mere "diagnostic label," as referred to in the legislative history. The presumption, however, is that a given term bears the same meaning throughout a statute or a regulation.[39] Thus, the Court may not presume that the meaning of "undiagnosed" and "diagnosed" as used in the wording of the statute, and incorporated into the regulation, differs from the meaning of "diagnosed" that the Secretary infers to be part of the provision dealing with MUCMI.

Moreover, the words of a regulation are given their ordinary and accustomed meaning.[40] A "diagnosis" is defined as "determination of the nature of a case of disease."[41] This definition extends beyond merely giving a name to a condition, but requires an understanding of the nature of an illness.

This inconsistency with the statute has more than semantic implications. Another portion of the Secretary's regulation excludes from compensation any disease that can be attributed to a "known clinical diagnosis."[42] The ordinary meaning of "clinical diagnosis" is a "diagnosis based on signs, symptoms, and laboratory findings during life."[43] This section of the regulation offers no alternative understanding of the term "clinical diagnosis," which, according to the regulation, is to be based on "history, physical examination, and laboratory tests."[44] The Secretary argued that Mr. Stewart's obstructive and restrictive lung condition was excluded from being a MUCMI because asthma is a clinical diagnosis, [45] although that argument was undeveloped.

It is unclear what sort of diagnosis—even the application of a diagnostic label—would not be a clinical diagnosis "based on" history, examination, signs, symptoms, and laboratory findings. Even the conditions defined by statute as MUCMIs are still identified by a clinical diagnosis, albeit

---

[39] *Gardner*, 513 U.S. at 118; *Voracek v. Nicholson*, 421 F.3d 1299, 1304 (Fed. Cir. 2005).

[40] *Ortiz-Valles*, 28 Vet.App. at 69 (and cases cited).

[41] DORLAND'S at 507.

[42] 38 C.F.R. § 3.317(a)(1)(ii).

[43] DORLAND'S at 507.

[44] 38 C.F.R. § 3.317(a)(1)(ii).

[45] Secretary's Brief at 6.

16

on the absence rather than the presence of identifiable factors by which the illness could be attributed to any other clinical condition. Chronic fatigue syndrome, for instance, requires, among other factors, "the exclusion by history, physical examination, and laboratory tests of all other clinical conditions that may produce similar symptoms."[46] So chronic fatigue syndrome would still arguably be a clinical diagnosis, although it would be classified as a diagnosis of exclusion.

The sum of this discussion is that just about any illness of interest to Gulf War veterans, with the possible exception of those identified by diagnoses of exclusion, would be attributed to a known clinical diagnosis. Such a clinical diagnosis to label a veteran's condition would be possible long before the medical community identified the cause of the condition, either conclusively or partially. During the AIDS crisis, for instance, the detection of reduced immune cells by laboratory blood tests, together with the symptoms and signs of the disease, could suffice to label the condition (i.e., yield a "clinical diagnosis") even though there was no understanding of the etiology of the condition. The etiology of the illness was explained only with the discovery of the Human Immunodeficiency Virus. The interaction of the Secretary's definition of a MUCMI as a "diagnosed condition" and the provision on "clinical diagnosis" operates such that future analyses of MUCMIs, apart from those named in the statute, may well yield the null set. That result is hardly in keeping with the legislative goal evident in the revision of the statute to include MUCMIs.

The "clinical diagnosis" provision has been part of the Secretary's regulation from the beginning. It may describe an "undiagnosed illness" and may not conflict with the definition of MUCMI if the latter is not required to be a "diagnosed condition" in the ordinary understanding of that term. That enigma begs for redrafting of the regulation, which the Court should declare invalid.

### III.    The Secretary's recourse to the legislative history produced an inherent contradiction that renders the regulation arbitrary and capricious.

The only possible reason for introducing the exclusionary concept of "partially understood etiology and pathophysiology" in § 3.317 is that it is contained in the legislative history. The Senate report stated: "In selecting this [statutory] language it is the intent of the Committee to ensure eligibility for chronically disabled Gulf War veterans notwithstanding a diagnostic label by a clinician in the absence of *conclusive pathophysiology or etiology*."[47] In the next paragraph, the

---

[46] 38 C.F.R. § 4.88a (2018).

[47] 147 Cong. Rec. S. 13,227, S. 13,238 (daily ed. Dec, 13, 2001) (statement of Sen. Rockefeller) (emphasis added).

17

committee report commented on the inclusion of the three illnesses (chronic fatigue syndrome, fibromyalgia, and irritable bowel syndromes) as examples of MUCMIs in the statute. The report then stated: "The Committees do not [intend] this definition to assert that the cited syndromes can be clinically or scientifically linked to Gulf War service based on current evidence, nor do they intend to include [MUCMIs] of *partially understood etiology and pathophysiology* such as diabetes or multiple sclerosis."[48] The first sentence of § 3.317(a)(2)(ii) corresponds to the first quoted remark and the second sentence of the regulation to the second quoted remark.

There is no need in this case to discuss the legal and doctrinal difficulties with employing legislative history in statutory interpretation,[49] or the confusing and contradictory statements regarding such usage contained in the caselaw of this Court and its reviewing court.[50] Suffice it to say that the Secretary's resort to legislative history *in this case* results in a blatant ambiguity rendering § 3.317(a)(2)(ii) unintelligible.

There is an inherent contradiction in the two sentences of § 3.317(a)(2)(ii), extracted from the legislative history. The first sentence of the regulation describes the characteristics of a MUCMI: "a diagnosed illness without *conclusive* pathophysiology or etiology." The term "conclusive," modifying "pathophysiology" and "etiology," is defined as "putting an end to a debate or question especially by reason of irrefutability: involving a conclusion or decision: decisive, final."[51] The second sentence purports to exclude illnesses of "partially understood etiology and pathophysiology." But if the etiology *and* pathophysiology of an illness are only

---

[48] *Id.* (emphasis added).

[49] *See Lawson v. FMR LLC,* 571 U.S. 429, 459-460 (2014) (Scalia, J., concurring).

[50] *Compare Wanner v. Principi*, 370 F.3d 1124, 1130 (Fed. Cir. 2004) ("[T]he clarity of the legislative scheme makes resort to the legislative history unnecessary.") *with Glaxo Operations U.K. Ltd. V. Quigg*, 894 F.3d 392, 395 (Fed. Cir. 1990) (legislative history should be examined at least to determine whether there is clearly expressed legislative intent contrary to the statutory language). *Compare Lee v. West*, 13 Vet.App. 388, 395 (2000) ("Because the plain meaning of the statute [contradicts] the Secretary's position we need not consider the statute's legislative history.") (citing *Daily v. Cisneros*, 509 U.S. 137 (1993) and *Frederick v. Shinseki*, 24 Vet.App. 335, 341 (2011), *rev'd on other grounds* 684 F.3d 1263 (Fed. Cir. 2012) ("We start with the axiom that legislative history is not legislation and cannot trump the plain meaning of the legislation.") (citing *Van Wersch v. Dept. of Health & Human Servs.*, 197 F.3d 1144, 1152 (Fed. Cir 1999)) *with Atencio v. O'Rourke*, 30 Vet.App. 74, 84 (2018) (legislative history should be examined to determine whether there is Congressional intent contrary to the plain meaning of the statute). *See also Cypert v. Peake*, 22 Vet.App. 307, 311 (2008) ("[T]he Court cannot read into a statute an alternative purpose premised on congressional intent.").

[51] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 471 (1966).

18

partially understood, it follows that the illness is without *conclusive* pathophysiology *or conclusive* etiology.

The examples of illnesses named in the regulation, as supposedly of partially understood etiology and pathophysiology, are of no help in resolving the ambiguity. As the Secretary argued,[52] both multiple sclerosis and diabetes are of unknown or inconclusive etiology, and therefore do not have "partially understood etiology *and* pathophysiology."[53] Although Congress could have explicitly excluded these illnesses from the statutory definition of MUCMIs, for whatever reason, it did not. More to the point, these illnesses do not clarify how an illness can be of only partially understood etiology and pathophysiology yet have conclusive etiology and conclusive pathophysiology.

We are left with a fundamental ambiguity that is not resolved by the incorporation of the legislative history remarks into the Secretary's regulation. "[A]mbiguities in the legislative history are insufficient to undercut the ordinary understanding of the statutory language."[54]

The most enthusiastic advocates of the use of legislative history agree that employing an inherently ambiguous legislative history to attenuate the plain meaning of statutory language is improper. Even where there are "contradictory indications in the statute's legislative history . . . we do not resort to legislative history to cloud a statutory text that is clear."[55] As Justice Kagan recently observed: "Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language."[56] "When legislative history does not contain 'clear evidence of congressional intent' and is 'more conflicting than the statutory text is ambiguous' it is of little use."[57] Here, the legislative history is ambiguous at best, and should not be employed to detract from the plain meaning of the statute.

---

[52] Secretary's Response to Supplemental Briefing Order of Jan. 17, 2018, at 11.

[53] *See* DORLAND'S at 1680 (32d ed. 2012) (etiology of multiple sclerosis is unknown).

[54] *Ardestani v. INS*, 502 U.S. 129, 137 (1991).

[55] *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) (citing *Barnhill v. Johnson*, 503 U.S. 393, 401 (1992) (appeals to legislative history are well taken only to resolve statutory ambiguity)).

[56] *National Assoc. of Mfrs. v. Dept. of Defense*, 138 S.Ct. 617, 634 n 9 (2018) (citing *Milner v. Dept. of Navy*, 502 U.S. 562, 572 (2011)).

[57] *Jensen v. Shinseki*, 29 Vet.App. 66, 76 n.7 (2017) (quoting *Milner*).

Thus, any chronic multisymptom illness about which the medical community possesses some knowledge, short of a conclusive understanding, is simultaneously within and without the MUCMI classification under the Secretary's regulation. The implementation of the regulation depends entirely on which sentence is the focus of the analysis, and it is indeterminate how the regulation would be applied to any medically unexplained illness other than those named in the statute. The word "capricious" means "characterized by or subject to whim."[58] Therefore, I believe the regulation adopted by the Secretary to implement the statute, § 3.317(a)(2)(ii), is arbitrary and capricious in substance.

### IV. There is no evidence on which to conclude that Mr. Stewart's asthma was not medically unexplained.

In the decision here on appeal, the Board stated that "asthma *may be due* to allergic manifestations or *provoked by* factors such as vigorous exercise, irritant particles, or psychological stress, among other causes."[59] The Board also cited a VA medical examination report that contained the following remarks:

> Per literature review, many things can trigger or worsen asthma symptoms. Triggers may cause asthma to flare up while directly in contact with a trigger. Triggers may include: Allergens from dust, animal fur, cockroaches, mold, and pollens from trees, grasses, and flowers; Irritants such as cigarette smoke, air pollution, chemicals or dust in the workplace, compounds in home décor products, and sprays (such as hairspray); Medicines such as aspirin or other nonsteroidal anti-inflammatory drugs and nonselective beta-blockers; Sulfites in foods and drinks; Viral upper respiratory infections, such as colds; Physical activity, including exercise.[60]

Invoking the regulatory concept of "partially understood etiology," the Board concluded that asthma is not medically unexplained.

"Etiology" is "the study or theory of the factors that cause disease and the method of their introduction to the host; the causes or origin of a disease or disorder."[61] Neither the medical definition of asthma nor the VA examination report furnishes any information as to the etiology of asthma, either partial or conclusive. That certain factors may trigger attacks once a person has

---

[58] WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 227 (1984).

[59] R. at 8 (citing the 30th edition of DORLAND'S at 168).

[60] R. at 59.

[61] DORLAND'S at 652.

20

asthma does not explain why that person contracted asthma in the first place. Factors that may trigger attacks have nothing to do with etiology, which requires an identification of the cause of a condition.

"Some cases [of asthma] are allergic manifestations in sensitized persons (*allergic a.*)."[62] But it is still not clear why certain persons contract asthma and others do not. Not all people with allergies have asthma, and not all asthmatics have allergies.[63] Thus, even in cases that can be classified as some type of allergic asthma, the illness is not medically explained.

Furthermore, there is no evidence that Mr. Stewart's asthma is attributable to any preexisting allergies. It should be noted that if his asthma could be traced to some sort of allergic reaction, the question would arise whether his sensitization occurred because of exposure to the dust or toxins to which he was indisputedly exposed in Iraq. But there is no medical evidence on this subject and the Board made no findings in that regard.

The parties disagree whether the term "medically unexplained" requires VA to identify the cause of a specific veteran's illness or may be resolved by general knowledge in the medical community about the illness. I fully agree with Judge Pietsch's analysis and conclusion that the determination of whether a condition is a MUCMI must be based on an individual veteran's circumstances. I emphasize, however, that there is no evidence in this record as to the etiology of asthma, either generally or in Mr. Stewart's particular case.

I would invalidate the Secretary's implementing regulation, 38 C.F.R. § 3.317(a)(2)(ii), as inconsistent with the statute and internally inconsistent. Nevertheless, I agree with the majority that the Board's October 20, 2015, decision should be set aside and this matter remanded for further development to determine whether Mr. Stewart's asthma is a medically unexplained chronic multisymptom illness in his particular situation, followed by readjudication.

SCHOELEN, *Judge*, *concurring in part and dissenting in part*: I join the Court's decision except that I respectfully dissent from that portion of the opinion pertaining to the specific etiology of a veteran's disease (Part II.B.). The dispute between the parties is whether the phrase "medically unexplained" requires VA to identify the etiology of a veteran's illness or whether VA may rely

---

[62] *Id.* at 168 (italics in original).

[63] *See id.* for a description of different types of asthma, some of which are not associated with any allergic reaction to known substances.

21

on the general knowledge in the medical community about the illness. The appellant argues that VA must identify the etiology of his individual asthma. The Secretary, on the other hand, contends that the term "etiology" in § 3.317(a)(2)(ii) refers to the cause of the diagnosed illness generally, rather than a specific etiological cause pertaining to an individual veteran.

The majority concludes that if the etiology of a veteran's specific illness is unknown, the illness may be considered a MUCMI, even though the etiology of the disease as it generally affects the public is known. The majority reaches this conclusion without pointing to specific language in either the statute or its implementing regulation. To the contrary, the statute and regulation specifically mention illnesses that are MUCMIs (fibromyalgia, chronic fatigue syndrome, and irritable bowel syndrome), as well as specific illnesses (diabetes and multiple sclerosis) that are not MUCMIs, without qualifying whether the etiology of a veteran's illness is known. *See Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006) (stating that the plain meaning of a regulation is controlling). Surely, had Congress intended that the defining characteristic of a MUCMI was whether the etiology of a veteran's specific illness was understood, it would have clearly stated this in the statute.

Instead of relying on the statutory or regulatory language, the majority relies upon *Goodman v. Shulkin*, 870 F.3d 1383 (Fed. Cir. 2017), to bolster its broad holding. As the majority correctly notes, Mr. Goodman was seeking presumptive service connection for rheumatoid arthritis (RA) as a MUCMI. In denying Mr. Goodman's claim, the Board relied on a medical opinion that concluded that RA was not a MUCMI because the etiology and pathophysiology of that condition were partially understood on a general basis in the medical community. This Court affirmed the Board decision.

On appeal, Mr. Goodman argued to the Federal Circuit that the Court effectively allowed the VA medical expert to establish a general rule that was binding in future claims that RA is not a MUCMI. *Id*. at 1386. Mr. Goodman claimed that the Court's ruling "'expand[ed] the authority of the medical expert beyond the facts of an individual case and improperly delegate[ed] authority for determining a qualifying disease to an individual physician.'" *Id*. The Federal Circuit soundly rejected this argument and held that § 3.317 did not "prohibit medical professionals from professing whether certain medical diseases may constitute a MUCMI" and that such medical opinions could be used by VA adjudicators when it made determinations in individual claims that came before it. *Id*. at 1387. Further, the Federal Circuit observed that the Board has "'the authority

to determine on a case-by-case basis whether additional diseases meet the criteria [for a MUCMI] *in the same manner as they make other determinations necessary in deciding claims*." [64] *Id.* (quoting 75 Fed. Reg. 61,995, 61,995 (October 7, 2010)). Ultimately, the Federal Circuit stated: "[W]e hold that VA adjudicators may rely on a medical examiner's evaluation of whether a veteran's condition qualifies as a MUCMI," *id.* and that the Board may consider medical evidence along with "other facts of record" to determine whether the "claimant has proven, based on the claimant's unique symptoms, the existence of a MUCMI," *id.* at 1380.

The majority seizes upon this language to conclude that *Goodman* endorses the notion that VA must pinpoint the etiology of Mr. Stewart's individual asthma. However, *Goodman* clearly does not make this broad pronouncement. Rather, the Federal Circuit held that the medical advisor's statement did not violate the requirement that VA adjudications are to be conducted on a case-by-case basis. In doing so, the Court affirmed the Board's reliance on a medical opinion that was based on the facts of Mr. Goodman's claim, including his individual symptoms, but also opined that RA had a partially explained and medically accepted etiology and pathophysiology. Thus, if anything, *Goodman* endorses VA's practice of relying on medical opinions that address the etiology of a disease generally, even though the medical opinion does not pinpoint the specific etiology of the individual claimant's disease.[65]

---

[64] By using the language "in the same manner as they make other determinations necessary in deciding claims," the Federal Circuit recognizes that, as in other service-connection claims, the Board reviews a medical examiner's findings along with other relevant evidence to decide whether the evidence before it establishes that the claimant has a condition that is related to service.

[65] The only other basis that the majority gives for its broad holding is the fact that the Secretary has acknowledged that whether an illness constitutes a MUCMI requires a medical opinion and that treatise evidence is not sufficient evidence to support a Board finding that an illness constitutes a MUCMI. However, VA generally does not rely on treatise evidence, alone, to decide whether a veteran's disability is related to service. To the contrary, this Court has long recognized that treatise evidence may help a veteran establish entitlement to service connection when it is accompanied by a medical examiner's opinion relating the particular veteran's illness to service. *See Sacks v. West*, 11 Vet.App. 314, 317 (1998) (treatise evidence when combined with an opinion of a medical professional can provide important nexus evidence to support a service-connection claim). Moreover, the observation by the majority that a medical opinion is needed to identify an illness as a MUCMI does not lend any insight to the question whether a doctor must pinpoint the specific etiology of a veteran's illness or rely on the knowledge in the medical community about the cause of the diagnosed illness generally.